Filed 8/29/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| BRIAN W. CRANE,<br><br>    Plaintiff and Appellant,<br><br>      v.<br><br>R. R. CRANE INVESTMENT CORP., INC.,<br><br>    Defendant and Respondent. | B310520<br><br>(Los Angeles County<br>Super. Ct. No. BC683006) |

      APPEAL from an order of the Superior Court of Los Angeles County, Robert B. Broadbelt, Judge. Affirmed.

      Akerman and Caroline H. Mankey for Plaintiff and Appellant.

      Ogden & Motley and Dale E. Motley; Buchalter, George J. Stephan and Harry W.R. Chamberlain II for Defendant and Respondent.

———————————

# INTRODUCTION

Brian Crane initiated an action for involuntary dissolution of R. R. Crane Investment Corporation, Inc. (R. R. Crane), a family-owned investment business that he shared with his brother Kevin Crane. To avoid corporate dissolution, Kevin and R. R. Crane invoked the statutory appraisal and buyout provisions of the Corporations Code.[1] In December of 2020, after a prolonged appraisal process, the trial court confirmed the fair value of Brian's shares at over $6.1 million, valued as of November 13, 2017, the date Brian filed for dissolution.

On appeal Brian contends the trial court erred by failing to award him prejudgment interest on the valuation of his shares. He argues he was entitled to interest at a rate of 10 percent per annum from the date he first sought dissolution until the eventual purchase of his shares more than three years later. We disagree that prejudgment interest must be added to the appraised value of Brian's shares, and we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *History of R. R. Crane and Brian's Complaint Seeking Involuntary Dissolution*

R. R. Crane is a family-owned corporation formed in 1960 by Brian's and Kevin's parents. The corporation primarily functions as a holding company for stock and real estate investments. When Brian filed his dissolution action, he and Kevin each held a 50 percent interest in R. R. Crane through

---

[1] Undesignated statutory references are to the Corporations Code.

their respective trusts.[2]  In July 2013 the brothers agreed Brian would serve as President of R. R. Crane and Kevin would serve as Vice President.  They were the company's only officers and directors.

On November 13, 2017, Brian filed a complaint seeking involuntary dissolution of R. R. Crane, pursuant to section 1800.[3] He asserted that in June 2014 Kevin "assumed control" of the company, excluded Brian from management decisions without Brian's consent, and "refuse[d] to release his control," which caused the company to incur unnecessary costs and decreased the value of the company's properties.

Brian stated he and his brother "disagree vehemently on nearly every aspect of the management of RR Crane and its assets" and their relationship "has deteriorated to a degree that is deleterious to RR Crane and is putting its assets and income at

[2]    Because the brothers share the same surname, we use their first names; in doing so we intend no disrespect.  We also note Brian and Kevin are parties to this action in their capacities as trustees of their respective trusts.

[3]    Section 1800 permits certain shareholders to file a verified complaint for involuntary dissolution of a corporation on specifically enumerated grounds.  Involuntary dissolution is available when "[t]he corporation has an even number of directors who are equally divided and cannot agree as to the management of its affairs" (subd. (b)(2)); "[t]here is internal dissention and two or more factions of shareholders in the corporation are so deadlocked that its business can no longer be conducted with advantage to its shareholders" (subd. (b)(3)); or "[i]n the case of any corporation with 35 or fewer shareholders . . . liquidation is reasonably necessary for the protection of the rights or interests of the complaining shareholder or shareholders" (subd. (b)(5)).

3

risk." Brian requested R. R. Crane "be wound up and dissolved," asserting "liquidation is reasonably necessary for the protection of the rights and interests" of his trust.

B. *Kevin and R. R. Crane's Notice of Intent To Purchase Brian's Shares, the Appraisal of the Fair Value of Those Shares and the Buyout*

On January 5, 2018, Kevin and R. R. Crane filed a notice indicating they intended to exercise their right to purchase Brian's shares pursuant to section 2000, in order to avoid the wind-up and dissolution of R. R. Crane. Two months later R. R. Crane filed an unopposed request to stay the dissolution action, stating that the brothers "have been unable to agree upon a fair price" for Brian's shares in the company. R. R. Crane posited "the most expeditious approach" would be for each brother to select an appraiser and then those two appraisers select a third appraiser to collectively determine the fair value of Brian's shares. Brian asked the court to require Kevin and R. R. Crane post a bond of at least $250,000 to cover Brian's legal costs and other fees that may be incurred in the appraisal process.

In May 2018 the trial court stayed the dissolution action pending the appraisal of Brian's shares; required R. R. Crane to post a $25,000 bond; adopted the proposed plan for designating three appraisers; and ordered that, on or before October 1, 2018, "the three appraisers, or a majority thereof, shall then submit an award regarding the value" of Brian's shares. R. R. Crane designated William Buckley as an appraiser. Brian designated Foss Consulting. The trial court eventually designated Raymond Moran as the third appraiser, whom Brian asserts was also proposed by Kevin and R. R. Crane. The court later extended the deadline for the award valuation to December 3, 2018.

4

On December 4, 2018, Kevin and R. R. Crane filed a notice of submission of appraisal by two appraisers, Buckley and Moran. The following day Brian filed a notice of submission of appraisal by appraiser Glenn Garlick (which incorporated the work of Foss Consulting), along with Brian's objections to the other two appraisals.

On December 19, 2018, counsel for Kevin and R. R. Crane filed an Award of Appraisers, executed by Buckley and Moran, valuing Brian's shares at $5,509,923.00, to which Brian filed an objection. In January 2019 R. R. Crane filed a motion for an order confirming the Award of Appraisers and setting a schedule for payment and transfer of the shares. Brian objected to the Award, noting that the amount of the Award was "inconsistent with all three of the appraisals" from Buckley, Moran and Garlick, which were $6,182,918, $6,071,025.50 and $6,565,000, respectively.

In February 2019 Brian filed a motion seeking a deferred valuation date for the appraisal of his shares, rather than the statutory default date, which was the date Brian filed for dissolution (November 13, 2017). Brian sought a "present valuation date" that would be "on or after the date of the Court's ruling on this motion" and "more closely approximates the actual date on which the sale of his interests is likely to be consummated." Brian maintained that in the 16-month period since he sought dissolution in November 2017, "the stock and real estate assets of RR Crane have increased in value, RR Crane has collected well over $1 million in net revenues," "the applicable federal tax rate has dropped from approximately 34% to 21%" and, "RR Crane has failed to make normal distributions of revenue to Brian."

5

On July 9, 2019, the trial court denied R. R. Crane's motion, concluding that the appraisers' purported valuation of $5,509,923 was not consistent with the valuation in either appraisal report and that "nothing in the Award explains how they jointly came to that number." The court also denied Brian's motion to set a deferred valuation date, finding the request untimely and that no good cause existed to change the valuation date given the appraisers had already prepared and submitted their reports and arrived at the "purported appraisal award." The court ordered the three appraisers, or two out of three if the three could not agree, to file a new award by September 10, 2019.

On September 9, 2019, counsel for Kevin and R. R. Crane submitted Buckley and Moran's Revised Award, concluding that Brian's gross value of shares was $6,182,918, or a net award of $5,304,750 with an offset for an outstanding loan and accrued interest that Brian allegedly owed R. R. Crane. In October 2019 R. R. Crane filed a motion to confirm the Revised Award. On January 29, 2020, Brian filed an opposition asserting, among other arguments, that prejudgment interest pursuant to Civil Code section 3287, subdivision (a), or section 3288 should be added to any appraisal award to afford him the "fair value" of his shares.

The trial court sua sponte continued the hearing on the motion to confirm the Revised Award numerous times, from February 2020 to December 2020.[4] On December 21, 2020, the trial court granted R. R. Crane's motion to confirm the Revised Award. The trial court confirmed the Revised Award's gross

---

[4]    At least three of these continuances were directly attributable to the COVID-19 pandemic and the "state of emergency" declared by the Governor of California.

valuation of Brian's shares at $6,182,918 and denied Brian's request for prejudgment interest.  The court set a deadline of January 15, 2021 for payment "if R. R. Crane desires to prevent the winding up and dissolution of R. R. Crane.  [Citation.]  If R. R. Crane does not make payment of that sum to plaintiff [Brian] no later than that date, then the court will enter judgment against defendant R. R. Crane and issue a decree for winding up and dissolution of R. R. Crane."  R. R. Crane elected to proceed with the buyout and paid the valuation amount, which Brian states he received "sometime between the December 21, 2020 court order and the January 15, 2021 deadline."[5]

Brian timely appealed the December 21, 2020 order.

## DISCUSSION

A.  *Standard of Review*

We review the "factual aspects of the fair value determination" made pursuant to section 2000 under the substantial evidence standard.  (*Goles v. Sawhney* (2016) 5 Cal.App.5th 1014, 1018; accord, *Mart v. Severson* (2002) 95 Cal.App.4th 521, 530.)  "'However, the superior court's interpretation of the statutory standard set forth in section 2000 is subject to de novo review on appeal.'"  (*Goles v. Sawhney*, *supra*, 5 Cal.App.5th at p. 1018.)  Likewise, interpretation of the prejudgment interest provisions in the Civil Code are also subject

---

[5]     R. R. Crane asserts in its respondent's brief that Brian transferred his shares in exchange for the valuation price.  We found nothing in the record evidencing the exchange, and Brian's briefing is silent as to whether he transferred his shares.  Because the parties do not dispute this fact, we assume the statutory buyout was completed.

7

to our independent review. (*Flethez v. San Bernardino County Employees Retirement Assn.* (2017) 2 Cal.5th 630, 639 (*Flethez*) [interpreting Civil Code section 3287, subd. (a)]; see generally *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1183 ["[s]tatutory interpretation is 'an issue of law, which we review de novo'"].)

B. *Analysis*

1. *Section 2000's buyout provisions*

In response to a corporate shareholder filing for involuntary dissolution,[6] section 2000 prescribes the procedure for a shareholder defendant, or the corporation, to avoid dissolution by purchasing the shares of the party who initiated dissolution. (*Schrage v. Schrage* (2021) 69 Cal.App.5th 126, 136 ["the 'statutory buyout provisions of the Corporations Code provide a defendant in an involuntary dissolution action with a mechanism for avoiding dissolution by purchasing the plaintiff's shares or other interests'"]; *Trahan v. Trahan* (2002) 99 Cal.App.4th 62, 75 (*Trahan*) ["[t]he objective of section 2000 is to provide an alternative to dissolution through a buy-out by the holders of 50 percent or more of the corporation"].) Once the non-initiating shareholders invoke this statutory procedure, the ensuing "special proceeding under section 2000 . . . 'supplants' a cause of action for involuntary dissolution." (*Ontiveros v. Constable* (2018) 27 Cal.App.5th 259, 264.) "In such a

---

[6] A 50 percent shareholder can also to seek a "voluntary" windup and dissolution pursuant to section 1900. Like the involuntary process, section 2000's alternative buyout procedures may be invoked in a voluntary dissolution. (See *Mart v. Severson* (2002) 95 Cal.App.4th 521, 524.)

8

[section 2000] proceeding, purchasing parties aspire to buy out the moving party, with minimal expenditure of time and money that would otherwise be spent in litigation, in order to preserve the corporation.  If they (or the corporation) cannot pay the purchase price, or decide not to do so, then both sides must walk away, receiving pro rata the proceeds resulting from dissolution of the corporation.  On the other hand, if the purchasing parties tender the amount determined by the court, the moving party cannot reject the share price as being too low." (*Go v. Pacific Health Services, Inc.* (2009) 179 Cal.App.4th 522, 531.)  Put differently, "[i]f the purchasing parties believe the price fixed by the court is too high, they can refuse to purchase the shares at that price and permit the winding up and dissolution of the corporation to proceed.  Their only liability would be to pay the expenses (including attorney fees) incurred by the moving parties in the appraisal process.  [Citations.]  No comparable provision allows moving parties to refuse to accept a share price they believe to be too low." (*Trahan*, at p. 75.)  In sum, "[t]he objective of the statutory appraisal process is to find a fair value for the shares of the parties seeking dissolution and to award the 50 percent shareholders seeking dissolution the liquidation value they would have received had their dissolution action been allowed to proceed to a successful conclusion." (*Ibid.*; accord, *Go*, at p. 531.)

Section 2000, subdivision (a), defines "fair value" as "the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation."  Subdivision (b) provides "[i]f the purchasing parties (1) elect to purchase shares owned by the moving parties, and (2) are unable to agree with the moving

9

parties upon the fair value of such shares, and (3) give bond with sufficient security to pay the estimated reasonable expenses (including attorneys' fees) of the moving parties if those expenses are recoverable under subdivision (c), the court upon application of the purchasing parties . . . shall stay the winding up and dissolution proceeding and shall proceed to ascertain and fix the fair value of the shares owned by the moving parties."

Section 2000, subdivision (c), instructs that "[t]he court shall appoint three disinterested appraisers to appraise the fair value of the shares owned by the moving parties, and shall make an order referring the matter to the appraisers so appointed for the purpose of ascertaining the value. . . . The award of the appraisers or of a majority of them, when confirmed by the court, shall be final and conclusive upon all parties. The court shall enter a decree, which shall provide in the alternative for winding up and dissolution of the corporation unless payment is made for the shares within the time specified by the decree. If the purchasing parties do not make payment for the shares within the time specified, judgment shall be entered against them and the surety or sureties on the bond for the amount of the expenses (including attorneys' fees) of the moving parties. Any shareholder aggrieved by the action of the court may appeal the court's decision." If the purchasing parties want "to prevent the winding up and dissolution, they shall pay to the moving parties the value of their shares ascertained and decreed within the time specified . . . . On receiving payment or tender thereof, the moving parties shall transfer their shares to the purchasing parties." (§ 2000, subd. (d).)

When the court fixes the fair value of the shares owned by the moving parties in an involuntary dissolution, "the valuation

date shall be . . . the date the involuntary dissolution action was commenced . . . . However, . . . the court may, upon the hearing of a motion by any party, and for good cause shown, designate some other date as the valuation date." (§ 2000, subd. (f).)[7]

---

[7] The Legislature enacted section 2000 in 1975 as part of a sweeping reorganization and revision "undertaken to modernize and streamline the General Corporation Law so as to embody principles and procedures designed to facilitate the conduct of business in a modern economy while maintaining and expanding upon this state's traditional protection of the rights of shareholders and creditors." (Assem. Select Com. on the Revision of the Corp. Code, Rep. on Assem. Bill No. 376 (AB 376) (1975-1976 Reg. Sess.) Dec. 1, 1975, Preface, pp. 1-2; *id.* at p. 1 [AB 376 "represents the first comprehensive revision of the General Corporation Law since its enactment in 1931"]; see Stats. 1975, ch. 682, § 7, eff. Jan. 1, 1977.) In particular, section 2000 was intended to improve and expand "[t]he statutory procedure authorizing the purchase by the other shareholders of the shares of the moving parties in a dissolution action." (Assem. Select Com. on the Revision of the Corp. Code, Rep. on AB 376 (1975-1976 Reg. Sess.) Dec. 1, 1975, p. 17; see also Legis. Com. com., reprinted at 23G West's Ann. Corp. Code (2014 ed.) foll. § 2000, p.5 ["[f]requently, the only source of sufficient cash to avoid dissolution is the corporation" and thus "[i]n order that the statutory 'buy-out' procedure establishes a meaningful alternative to termination of the enterprise, this section provides the corporation with the first right to purchase the shares of the moving parties"].)

Our review of Corporations Code section 2000's legislative history revealed no discussion about, or consideration of, prejudgment interest. Moreover, Corporations Code section 2000's origins trace back to the 1941 amendment of former Civil Code section 404 (Stats. 1941, ch. 610, p. 2057, § 1), which in turn served as the predecessor statute to Corporations

## 2. *The trial court did not err in denying Brian prejudgment interest on the valuation of his shares*

Brian's sole contention on appeal is that the trial court erred in failing to add prejudgment interest to the value of his shares, which were appraised as of November 13, 2017. He did not receive payment for those shares until approximately three years later and claims the lengthy delay was due to various continuances and hold-ups in the litigation. Brian asserts a number of equitable reasons as to why he is entitled to

Code former sections 4658 and 4659 enacted in 1947 (Stats. 1947, ch. 1038), from which Corporations Code section 2000 was derived—all of which are silent as to prejudgment interest.

Section 2000, as enacted in 1975, was also silent as to the date on which the shares should be valued. In 1983 the Legislature passed Senate Bill No. 285 (SB 285) (1983-1984 Reg. Sess.), which amended section 2000 to add subdivision (f). (Stats. 1983, ch. 247, § 1, pp. 741-743.) The source of SB 285, the Beverly Hills Bar Association (BHBA), chose the date upon which the dissolution action was commenced "to be the standard valuation 'on the ground that it is most equitable to value the shares of the shareholders seeking dissolution as of the date they first sought to terminate the existence of the corporation.'" (Assem. Com. on Judiciary, Rep. on SB 285 (1983-1984 Reg. Sess.) June 27, 1983, p. 2.) According to the BHBA, the impetus behind SB 285 was that the question of which date to use for the valuation required in section 2000 "frequently 'gives rise to considerable in-court controversy, on an issue as to which the statute provides no guidance whatever.'" (Assem. Com. on Judiciary, Rep. on SB 285 (1983-1984 Reg. Sess.) June 27, 1983, p. 2.) "The BHBA argues that, by establishing a standard date for the valuation . . . much of the controversy and expense involved in establishing the appropriate date would be eliminated." (*Ibid.*)

prejudgment interest, including: "(1) the time value of the money owed to him as of November 13, 2017, (2) the opportunity value that he lost as a result of not being able to reinvest that money in 2017 in income-producing investments, and (3) the substantial income and increased value of his interests in R. R. Crane from 2017 to 2021."

Brian predicates his argument, that he is entitled to prejudgment interest, on Civil Code section 3287, subdivision (a), or, alternatively, Civil Code section 3288. Brian's reliance on, and interpretation of, these statutes is misguided.

### a. *Civil Code section 3287, subdivision (a)*

The plain language of Civil Code section 3287, subdivision (a), which governs damages in civil cases, belies Brian's assertion that a valuation of corporate shares pursuant to the statutory buyout provisions of Corporations Code section 2000 falls within its ambit. Civil Code section 3287, subdivision (a), provides that "[a] person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day . . . ." Thus, by its express terms, Civil Code section 3287 prescribes interest only for those who are entitled to recover "damages." Brian states that "the law is clear that 'damages' under [Civil Code] section 3287 'is defined broadly to include any compensatory monetary recovery,'" quoting *Irwin v. Mascott* (N.D. Cal. 2000) 112 F.Supp.2d 937, 956. In actuality, as the California Supreme Court recently noted, section 3281 of the Civil Code "defines 'damages' as monetary compensation for one 'who suffers detriment from the unlawful act or omission of another.'" (*Flethez, supra,* 2 Cal.5th at p. 635, fn. 2, quoting Civ.

13

Code, § 3281 ["[e]very person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages"].) As the Supreme Court further explained in *Flethez*, "in order to recover prejudgment interest under [Civil Code section 3287, subdivision (a)], 'the claimant must show: (1) an underlying monetary obligation, (2) damages which are certain or capable of being made certain by calculation, and (3) a right to recovery that vests on a particular day.'" (*Flethez*, at p. 640.) These prerequisites to prejudgment interest are inapposite to the statutory framework set forth in Corporations Code section 2000.

When R. R. Crane elected to pay the fair value for Brian's shares pursuant to Corporations Code section 2000, it was not equivalent to Brian receiving "damages" for a detriment he suffered "from the unlawful act or omission of another," nor was it a sum R. R. Crane was obligated to pay. (Civ. Code, § 3281.)[8] Corporations Code section 2000 permits the shareholder defendant to choose whether to buy out the seller's shares after the court's confirmation of the purchase price; there is no requirement to do so. (See *Mart v. Severson*, *supra*, 95 Cal.App.4th at p. 525 ["once the fair value is set pursuant to section 2000, the purchasing parties have the right, but no

---

[8] Brian also quotes *Flethez* for the following proposition: "'[T]he primary purpose of section 3287(a) is to provide just compensation' to the party to whom money is owed for loss of use of the money during the prejudgment period, in order 'to make the plaintiff whole . . . .'" But he omits the concluding clause "as of the date of injury." Here, Brian and R. R. Crane proceeded pursuant to the statutorily sanctioned involuntary dissolution and buyout procedures. There was no plaintiff who was owed money "as of the date of injury."

14

corresponding obligation, to purchase the moving parties' shares at the fair value price"]; see also *Go v. Pacific Health Services, Inc., supra*, 179 Cal.App.4th at p. 531 ["[i[f [the shareholder] (or the corporation) cannot pay the purchase price, or decide[s] not to do so, then both sides must walk away, receiving pro rata the proceeds resulting from dissolution"].) The party seeking the dissolution does not have a right or an entitlement to a buyout. Instead, once the complainant seeks the dissolution, the shareholder defendant (or the corporation) may elect to purchase the shares after the trial court confirms the valuation. Corporations Code section 2000 provides for an optional business exchange within the prerogative of the buyer, which is presumably driven by the fair value of the shares as ascertained by the appraisers and confirmed by the court.

In *Abrams v. Abrams-Rubaloff & Associates, Inc.* (1980) 114 Cal.App.3d 240, 250-251 (*Abrams*), the Court of Appeal rejected the same contention Brian raises: that the trial court erred in not adding prejudgment interest to the "fair value" of shares appraised pursuant to Corporations Code section 2000's buyout procedures. The court provided two sound reasons for its holding: "First, the pendency of the appraisal did not in any way alter [plaintiff's] rights as a shareholder. Until [buyer] or the corporation actually purchased [plaintiff's] stock, [plaintiff] would continue to enjoy any benefits accruing to him as a 50 percent shareholder, including the receipt of any dividends.[9] Second, the

---

[9] Typically a plaintiff in a section 2000 proceeding would be entitled to the same dividends or distributions received by other shareholders until a buyout occurs. (See *Abrams, supra*, 114 Cal.App.3d at p. 250.) We note that in his February 2019 declaration Brian asserted that "Kevin and RR Crane have not

15

election pursuant to section 2000 does not amount to a firm commitment to purchase, and the corporation could still be dissolved." (*Abrams*, at pp. 250-251.) The court concluded that Civil Code section 3287, subdivision (a), which provides "for interest on an award of damages" was "inapplicable."[10] (*Abrams*,

distributed to me the usual income received by RR Crane since this action was filed. Typically, Kevin and I confer in or around June of each year . . . and decide how much of RR Crane's net revenues to distribute in dividends to us. We did not do that in 2018 and RR Crane is holding and has not distributed the bulk of the net revenues received in 2017 and 2018. RR Crane currently has over $1 million in a non-interest bearing checking account. Normally, a substantial portion of that cash would have been distributed to Kevin and me as dividends." Even if he was denied distributions after he filed his action for involuntary dissolution, in his appeal Brian does not challenge the court's denial of his request for a deferred valuation date under section 2000, subdivision (f), which may have accounted for the undistributed income and dividends he was allegedly owed.

[10] In his opening brief, Brian cites *Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 796-797 for the similar proposition that Civil Code section 3287 "has been consistently applied to require the award of prejudgment interest where the judgment is money owed or to be refunded pursuant to a statutory obligation." While *Levy-Zentner* makes clear that the form of the underlying cause of action—whether sounding in tort, contract or arising from statute—is not determinative, in order for the requirement of prejudgment interest to apply, the defendant must have some legally cognizable obligation to pay the plaintiff. And, as discussed, a valuation pursuant to Corporations Code section 2000 does not create an obligation or commitment to purchase the shares, nor

16

at p. 251.) We agree with the court's reasoning and its conclusion.[11] A plaintiff's entitlement to prejudgment interest pursuant to Civil Code section 3287, subdivision (a), does not apply to a buyout of shares under Corporations Code section 2000.[12]

### b. *Civil Code section 3288*

Brian's alternative contention—that he is entitled to prejudgment interest under Civil Code section 3288—also fails. Civil Code section 3288 provides that "[i]n an action for breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." The trial court correctly applied the plain language of Civil Code section 3288 and concluded that the

does it vest plaintiff with any right to recover the valuation amount. (See *Mart v. Severson, supra,* 95 Cal.App.4th at p. 525.)

[11] We note that *Abrams, supra,* 114 Cal.App.3d 240 predated the 1983 amendment of section 2000 that added subdivision (f), setting the valuation date as the date on which the plaintiff commenced the involuntary dissolution action. (See Stats. 1983, ch. 247, § 1.) As such, while the appraisers in *Abrams* used the date the buyer invoked the section 2000 buyout procedures rather than the date on which the plaintiff initiated the dissolution action (*Abrams*, at p. 246), the distinction has no discernible impact on the court's holding and analysis.

[12] Because we conclude that Civil Code section 3287 does not apply to buyouts pursuant to Corporations Code section 2000, we do not reach R. R. Crane's alternate argument that prejudgment interest also could not be awarded because the valuation was not "certain, or capable of being made certain" within the meaning of Civil Code section 3287, subdivision (a).

17

valuation award "is not based on the breach of an obligation not arising from contract or a showing of oppression, fraud, or malice." (See *Levy-Zentner*, *supra*, 74 Cal.App.3d at p. 786 ["the language of [Civil Code] section 3288 is expressly limited to certain types of actions"].) Indeed, Brian makes no attempt to argue that the payment he received from R. R. Crane was for anything other than the voluntary buyout of his shares consistent with the procedures in Corporations Code section 2000. Because the payment was not for a breach of an obligation, and there was no finding of oppression, fraud, or malice by the defendants, Civil Code section 3288 is inapplicable.[13]

c. *Prejudgment interest as an equitable remedy*

Brian argues that we should impose prejudgment interest as an equitable remedy to counteract any unfairness in the trial court's fair value determination. We acknowledge that "as with a corporate dissolution, the section 2000 buy-out procedure is subject to equitable limitations." (*Trahan, supra,* 99 Cal.App.4th at p. 78.) Section 2000 provides the trial court with a mechanism to address the type of injustice that Brian alleges here—namely that the valuation of his shares was deficient because there was a several year delay between the date of valuation and payment. Specifically, section 2000, subdivision (f), prescribes that "the court may, upon the hearing of a motion by any party, and for

---

[13] Although Brian insists Kevin and R. R. Crane were obligated to pay him, Brian's contention ignores the language of section 2000, which makes clear the non-initiating party is under no obligation to purchase the shares of the party seeking the dissolution. (See *Abrams*, *supra*, 114 Cal.App.3d at p. 251; see also *Mart v. Severson*, *supra*, 95 Cal.App.4th at p. 525.)

good cause shown, designate some other date as the valuation date."

In *Trahan*, the initiating party complained that the valuation was too low because the appraisal failed to consider the corporation's unperformed contracts that would come to fruition during the subsequent winding up period, even if those contracts had no cognizable worth as of the default statutory valuation date. (*Trahan*, *supra*, 99 Cal.App.4th at pp. 72, 74.) The Court of Appeal explained that the purported discrepancy could have been addressed by the trial court had the plaintiff sought a deferred valuation date pursuant to subdivision (f) of section 2000. (*Trahan*, at pp. 76-77.) While Brian filed a motion in the trial court for a deferred valuation date, on appeal he does not contest the court's denial of that motion. Instead, his appeal is limited to his argument that he is entitled to prejudgment interest on the valuation of his shares. Because there is no such entitlement to prejudgment interest under section 2000, we affirm.

## DISPOSITION

The trial court's order is affirmed.  Respondent is to recover its costs on appeal.

WISE, J.[*]

We concur:

SEGAL, Acting P. J.

FEUER, J.

---

[*]     Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.